**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **INTEGRATED GENOMICS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **v.** | ) | |
| | ) | **Magistrate Judge Keys** |
| **NIKOS KYRPIDES and** | ) | |
| **NATALIA IVANOVA,** | ) | **No. 06 C 6706** |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Integrated Genomics, Inc. ("Integrated Genomics") filed a four-count amended complaint against defendants Nikos Kyrpides ("Kyrpides") and Natalia Ivanova ("Ivanova") (together, "defendants") alleging (1) breach of a covenant not to compete, (2) breach of a duty of loyalty, (3) tortious interference with prospective economic advantage, and (4) common law unfair competition. Defendants have moved to dismiss the amended complaint on the basis of a lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief may be granted under Fed. R. Civ. P. 12(b)(6). For the following reasons, their motions [#31, #33] are granted in part and denied in part.

I.      **Facts**

The following facts are taken from Integrated Genomics' amended complaint. Dkt. No. 30. Integrated Genomics is a company that develops software for analyzing genomes. Amended Complaint, at ¶ 12. A genome is an organism's full set of chromosomes: all of its inheritable traits. American Heritage Dictionary (4th Ed. 2006), *available at* http://dictionary.reference.com/browse/genome. Kyrpides was hired by Integrated Genomics in

1999 as an annotator of its ERGO™ bioinformatics software.  Amended Complaint, at ¶¶ 13, 20.  Over the course of his employment with Integrated Genomics, Kyrpides was ultimately promoted to Director of Bioinformatics.  Amended Complaint, at ¶ 14.  "Bioinformatics" means "[t]he use of computer science, mathematics, and information theory to model and analyze biological systems, especially systems involving genetic material."  American Heritage Science Dictionary (2002), *available at* http://dictionary.reference.com/browse/bioinformatics.  Ivanova was hired by Integrated Genomics in 1999 as a research scientist.  Amended Complaint, at ¶ 27.  She eventually became a principal assistant to Kyrpides.  Amended Complaint, at ¶ 33.

By virtue of their employment with Integrated Genomics, Kyrpides and Ivanova both had access to and worked to develop confidential information and trade secrets for Integrated Genomics.  Amended Complaint, at ¶¶ 15, 28.  They both signed employment agreements, which contained identical covenants not to compete and not to disclose proprietary information:

6. Non-Compete.

(a) During the Employment Period and for a period of two years after the termination or expiration thereof, the Employee will not directly or indirectly:

(i) As an individual proprietor, partner, stockholder, officer, employee, director, joint venturer, investor, lender, or in any other capacity whatsoever (other than as the holder of not more than one percent (1%) of the total outstanding stock of a publicly held company), engage in the business of developing, producing, marketing or selling products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed or sold by the Company, or planned to be produced, marketed, or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while the Employee was employed by the Company; or

(ii) recruit, solicit or induce, or attempt to induce, any employee or employees of the Company to terminate their employment with, or otherwise cease their relationship with, the Company; or

(iii) solicit, divert, or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served by the Employee while employed by the Company.

(b) If any restriction set forth in this Section 6 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(c) The restrictions contained in this Section 6 are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose. The Employee agrees that any breach of this Section 6 will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

7. Proprietary Information and Developments.

7.1 Proprietary Information.

(a) Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, and customer and supplier lists. Employee will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after his employment, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

Exs. A and C to Amended Complaint.

Kyrpides worked for Integrated Genomics from 1999 until he resigned in April of 2004.

Amended Complaint, at ¶¶ 21-23. During that time he received a salary and benefits worth

between $84,000 and $120,000 per year. *Id.* Ivanova worked for Integrated Genomics from

1999 until her resignation in May of 2004. Amended Complaint, at ¶¶ 34, 36. During that time she received a salary and benefits worth between $50,000 and $75,000 per year. *Id*. Both Kyrpides and Ivanova then went to work for the Joint Genome Institute in its Microbial Genome Analysis Program. Amended Complaint, at ¶¶ 24, 38. There, Kyrpides oversaw development of the Joint Genome Institute's IMG software product, which directly competes with Integrated Genomics' ERGO™ software. Amended Complaint, at ¶ 26. Ivanova "played a role" in the development of the IMG software. Amended Complaint, at ¶ 39. Integrated Genomics alleges on information and belief that before leaving their positions at Integrated Genomics, both Kyrpides and Ivanova solicited numerous colleagues to leave the company and to accept positions at the Joint Genome Institute. Amended Complaint, at ¶¶ 25, 37.

## II.    Subject Matter Jurisdiction

This is the second time that the court has been required to examine the adequacy of Integrated Genomics' jurisdictional allegations. On January 13, 2007, Ivanova moved to dismiss the original complaint for failure to state a claim upon which relief may be granted. Kyrpides filed a similar motion on April 12, 2007. On June 13, 2007, this court undertook a *sua sponte* inquiry to determine if subject matter jurisdiction in this case was proper and determined that Integrated Genomics had not properly alleged the citizenship of Kyrpides or Ivanova. Dkt. No. 29. The case was therefore dismissed without prejudice with leave to replead.

Integrated Genomics now alleges that Kyrpides is a Greek citizen, currently residing in California, and that Ivanova is a Russian citizen, also currently residing in California. Amended Complaint, at ¶¶ 2-3. Integrated Genomics is a Delaware corporation that has its principal place of business in Chicago, Illinois. Amended Complaint, at ¶ 1.

In the defendants' current motions to dismiss, they argue first that Integrated Genomics' allegations are insufficient because it did not properly plead that neither Kyrpides nor Ivanova is a permanent resident alien (in which case citizenship is determined differently than it is for non-permanent resident aliens), and that it should be required to amend its complaint again. This is incorrect, because courts "indulge the assumption that an alien is domiciled outside the United States, and leave it to the challenger to allege otherwise if there is reason to believe that the foreigner is a permanent resident who would destroy diversity." *Karazanos* v. *Madison Two Assocs.*, 147 F.3d 624, 628 (7th Cir. 1998). Failure to allege that Kyrpides and Ivanova are not permanent resident aliens therefore does not render Integrated Genomics' jurisdictional allegations defective. *Id.* Furthermore, Kyrpides and Ivanova admit in their motions that they are not permanent residents. Therefore, this is not a basis for dismissal.

Kyrpides and Ivanova also challenge Integrated Genomics' allegation that the amount in controversy in this case exceeds $75,000. In its order of July 26, 2007, the court ordered Integrated Genomics to supplement its pleadings with an affidavit that supports its allegation that the amount in controversy exceeds $75,000. Dkt. No. 35.

Integrated Genomics filed the declaration of John W. Elling, "a CEO of Integrated Genomics," along with its response to the defendants' motions to dismiss. Declaration, Exhibit 1 to Integrated Genomics' Response, Dkt. No. 36, at ¶ 1. Elling declares that "as a result of defendants' actions, IG [Integrated Genomics] has lost a substantial number of customers. For example, at least 7 former customers of IG have switched to the JGI (the defendants' employer)…. [r]esulting in a loss to IG of approximately $150,000." Declaration, at ¶ 3. Elling also discusses the company's lost academic customers:

Next, from a review of the 2006 JGI Progress Report, which is available online, the JGI has listed their academic gene sequencing program customers. At least, 8 researchers on 18 projects with whom IG used to work are now working with the JGI. They would not have been able to do this if the defendants did not develop the competing software for the JGI in breach of their Employment Agreements. This has damaged IG in the amount of at least $20,000 in lost subscriptions and the lost revenue from annotating 18 microbial genomes is approximately, at least $180,000.

Declaration, at ¶ 5. In support of these statements, Elling attaches an email that Kyrpides

sent to an Integrated Genomics employee after he had already left the company:

> please do not distribut this email
> or try to contact them as it will be as I am trying to advertise IG.
> I just want to show you that you guys have indeed LOST what I would predict to be a very large number of contracts from academics if we would have used ergo.
> …
> Now of course this is over, as we ll pursue our own analysis and our own system, and the academics will have to go with us.
> of course money lost is one things here, the worst is the fame that would have been associated with that.
> …
> Mistakes like these make all the difference.
> Anyway, I am in greece enjoying the weather and listening to Peer Bork, Ari Patrinos and Venter talks
>
> Best,
> Nikos

Declaration, Exhibit A.

Elling also discusses Integrated Genomics' loss as a result of Kyrpides's alleged

solicitation of Ivanova's departure:

> IG lost an employee capable of performing commercial genome annotation when Natalia Ivanova joined Nikos Kyrpides. IG also lost revenue in being unable to pursue annotation work with the manpower to get the work done in a reasonable time frame. It would cost at least $30,000-$40,000 in employee time and recruiter fees to hire someone to fill her position. Also, it would cost approximately $75,000-$100,000 in salaried time for a new annotator to become profitable in their job.

Declaration, at ¶ 7.

      If diversity jurisdiction is uncontested, federal courts will accept an allegation of a sufficient amount in controversy unless it "appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Target Market Pub., Inc.* v. *ADVO, Inc.*, 136 F.3d 1139, 1142 (7th Cir. 1998) (citing, *inter alia*, *St. Paul Mercury Indemnity Co.* v. *Red Cab Co.,* 303 U.S. 283, 289, 58 S. Ct. 586, 590, 82 L. Ed. 845 (1938)). If the amount in controversy is contested, the party invoking federal jurisdiction must provide "competent proof" of facts that determine that the amount is at least $75,000, meaning that it must prove them by a preponderance of the evidence. *Meridian Sec. Ins. Co.* v. *Sadowski*, 441 F.3d 536, 540, 543 (7th Cir. 2006); *see also Oshana* v. *Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir. 2006). "Once the facts have been established, uncertainty about whether the plaintiff can prove its substantive claim, and whether damages (if the plaintiff prevails on the merits) will exceed the threshold, does not justify dismissal." *Id.* The party invoking federal jurisdiction need not show that the plaintiff will prevail or that he is certain to collect more than $75,000 if he does. *Rising-Moore* v. *Red Roof Inns*, *Inc.*, 435 F.3d 813, 816 (7th Cir. 2006). "The burden, rather, is to show what the plaintiff hopes to get out of the litigation; if this exceeds the jurisdictional amount, then the case proceeds in federal court unless a rule of law will keep the award under the threshold." *Id*; *see also Brill* v. *Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005). This may be done through submission of affidavits or other evidence outside of the pleadings. *Meridian*, at 541-42.

Subject matter jurisdiction is to be determined as of the time when jurisdiction is invoked. *Cook v. Winfrey,* 141 F.3d 322, 326 (7th Cir. 1998).[1]

In this case, the defendants argue that Elling's statements are speculative, conclusional, and inadmissible as lacking personal knowledge and as unhelpful lay opinion testimony. They say that Elling's declaration merely states that after they left Integrated Genomics, it lost customers to their new employer, the Joint Genome Institute. Defendants argue that Elling has not provided a foundation for making a connection between their alleged breach and Integrated Genomics' alleged losses and that his statements are therefore insufficient to establish the requisite competent proof.

The court agrees that standing alone, the Elling declaration does not provide the requisite foundation for its statements about the customers and money that Integrated Genomics has lost as a result of defendants' actions. It does not discuss, among other things, whether the lost customers were Kyrpides's or Ivanova's customers, whether Kyrpides or Ivanova had any contact with those customers while at Integrated Genomics, or what the circumstances were of the customers' decisions to switch to the Joint Genome Institute. Without this information, although the circumstances certainly look suspicious, Integrated Genomics has not proven by a preponderance of the evidence that it sustained over $75,000 in damages as a result of the defendants' departure.

---

[1] For cases applying this standard, *see Jansen* v. *Am. Exp. Corp.*, 2007 WL 4293635, at *2 (N.D. Ill. Dec. 6, 2007); *Ganjavi* v. *Smith*, 2007 WL 2298375, at *4 (N.D. Ill. July 31, 2007); *Hannenberg* v. *Baker*, 2004 WL 2700490, at *1 (N.D. Ill. Feb. 2, 2004) (Lefkow, J.); *Selway Group, Inc.* v. *Globalnet Int'l, Inc.*, 2001 WL 755232, at *1 (N.D. Ill. July 2, 2001) (Lefkow, J.)

With respect to Kyrpides, however, the court has an additional piece of evidence: the email that Kyrpides sent to someone at Integrated Genomics after his departure bragging that "I just want to show you that you guys have indeed LOST what I would predict to be a very large number of contracts from academics…." Kyrpides does not dispute the authenticity of this email and it would be admissible at trial as a party admission. Furthermore, Kyrpides is alleged to have been the Director of Bioinformatics at Integrated Genomics in charge of developing the ERGO™ bioinformatics software. He went to Integrated Genomics' direct competitor, the Joint Genome Institute, to oversee the development of software that competes directly with ERGO™, and a substantial number of Integrated Genomics' customers followed close behind. These circumstances, together with Elling's declaration and Kyrpides's own statement regarding the relationship between his departure and Integrated Genomics' loss of customers, provides the necessary competent proof that Integrated Genomics lost customer accounts worth more than $75,000 as a result of Kyrpides's departure. Because it does not appear to a legal certainty that Integrated Genomics could not recover this amount, the court finds that Integrated has established that the amount in controversy against Kyrpides exceeds the jurisdictional minimum.

The court will consider two additional arguments regarding the amount in controversy for Ivanova. First, the parties dispute the relevance of a settlement offer that Integrated Genomics made to Ivanova: $10,000 plus an agreement that for a period of 24 months she would be "enjoined pursuant to FRCP 65 from being employed in the field of microbial genomics …." Settlement offers are admissible to show what the amount in controversy is. *Rising-Moore* v. *Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir. 2006). In order to determine the value of the settlement offer here, the court would need to determine the value of the injunction to Integrated

Genomics (or the cost of enforcing it to Ivanova). *Meridian*, 441 F.3d at 542; *see also*

*Milwaukee Mailing, Shipment and Equipment, Inc.* v. *Neopost, Inc.*, 259 F. Supp. 2d 769, 773

(E.D. Wis. 2003) (discussing the proper way to show the value of an injunction in a covenant not

to compete case). It is Integrated Genomics' burden to show what this value is, however, and all

it has said on the subject is, "Injunctive relief is requested in this action, and Defendants would

surely have some costs involved in implementing it." Response, at 4.

Finally, Elling's estimation of how much it would cost the company to hire and train

someone to replace Ivanova cannot establish the amount in controversy against Ivanova. It has

the potential to provide an alternative basis for establishing the amount in controversy for

Integrated Genomics' claims against Kyrpides because these damages are allegedly a result of

Kyrpides's violation of the non-solicitation clause. With respect to Ivanova, however, while the

covenant prohibited her from engaging in the business of competing against Integrated

Genomics, it did not prohibit her from leaving the company at all. Therefore, damages that

would have resulted from her departure to work at McDonald's cannot establish the amount in

controversy against her for the claims at issue in this case. Furthermore, "[i]n diversity cases,

when there are two or more defendants, plaintiff may aggregate the amount against the

defendants to satisfy the amount in controversy requirement *only* if the defendants are jointly

liable." *Middle Tennessee News Co., Inc*. v. *Charnel of Cincinnati, Inc.*, 250 F.3d 1077, 1081

(7th Cir. 2001) (emphasis added). Although Integrated Genomics alleges that Kyrpides and

Ivanova are jointly liable for its damages in this case, it has suggested no basis for joint liability

with respect to this specific loss.

For these reasons, the court has subject matter jurisdiction over Integrated Genomics'

claims against Kyrpides, but not against Ivanova.  She will therefore be dismissed from this case.

## III.  Discussion

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the

complaint on the basis of a failure to state a claim upon which relief may be granted.  In ruling

on the motion, the court accepts as true all well-pleaded facts alleged in the complaint and draws

all reasonable inferences from those facts in favor of the plaintiff.  *Jackson* v. *E.J. Brach Corp.*,

176 F.3d 971, 977 (7th Cir. 1999).  Dismissal is proper only when it appears beyond doubt that

the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.

*McCready* v. *eBay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).  The complaint must, however, allege

"enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp.* v.

*Twombly*, – U.S. –, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).

### A.  Enforceability of the covenants not to compete

Covenants not to compete are restraints on trade and, as such, are closely scrutinized by

Illinois courts.  *Cambridge Eng'g, Inc.* v. *Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522,

316 Ill. Dec. 445 (Ill. App. Ct. 1st Dist. 2007); *Agency, Inc.* v. *Grove*, 839 N.E.2d 606, 613-14,

362 Ill. App. 3d 206, 214, 298 Ill. Dec. 283 (Ill. App. Ct. 2nd Dist. 2005); *Roberge* v. *Qualitek*

*Int'l, Inc.*, 2002 WL 109360, at *4 (N.D. Ill. Jan. 28, 2002).[2]  "For a restrictive covenant to be

valid and enforceable in Illinois, the terms must be 'reasonable and necessary to protect a

---

[2] The parties agree that the employment agreement should be construed, interpreted, and enforced according to Illinois law, as is provided in the agreement.  *See* Exs. A and C to Amended Complaint.

legitimate business interest of the employer.'" *Cambridge Eng'g*, 879 N.E.2d at 522 (citation omitted); *Agency*, 839 N.E.2d at 614. The terms (1) must not be greater than necessary to protect the employer; (2) must not be oppressive to the employee; and (3) must not injure the general public. *Liautaud* v. *Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000) (citing Illinois state court cases); *House of Vision, Inc.* v. *Hiyane*, 225 N.E.2d 21, 24, 37 Ill. 2d. 32 (1967); *Bauer* v. *Sawyer*, 134 N.E.2d 329, 331, 8 Ill. 2d 351 (1956). This analysis requires the court to consider the propriety of the restrictions in terms of their length in time, their territorial scope, and the activities that they restrict. *Cambridge Eng'g*, 879 N.E.2d at 522.

The question of whether a restrictive covenant is reasonable or not is one of law that is to be decided by the court. *Liautaud*, 221 F.3d at 986 (citing Illinois state court cases). Reasonableness cannot be determined in the abstract, however, and it necessarily depends on the unique facts and circumstances of each case. *Liautaud*, 221 F.3d at 987 (citing Illinois state court cases); *Bus. Records Corp.* v. *Lueth*, 981 F.2d 957, 959 (7th Cir. 1992); *Cambridge Eng'g*, 879 N.E.2d at 522.

As noted above, Kyrpides signed a covenant not to compete that provided that he would not "engage in the business of developing, producing, marketing or selling products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed or sold by the Company...." In his motion to dismiss, he argues that this covenant must be deemed unenforceable as a matter of law because, as a blanket prohibition on competition unlimited in scope or geography and not limited enough in time, it is beyond what is necessary to protect Integrated Genomics. Integrated Genomics' response is that this issue cannot be decided on a motion to dismiss.

Under Illinois state law, there appears to be a split among the appellate districts regarding whether the reasonableness of a restrictive covenant may be determined on a motion to dismiss. *Compare Dryvit System, Inc.* v. *Rushing*, 477 N.E.2d 35, 38-39, 132 Ill. App. 3d 9, 87 Ill. Dec. 434 (Ill. App. Ct. 1st Dist. 1985) (granting judgment on the pleadings to the defendant because the covenant was patently unreasonable), *with Smith* v. *Burkitt*, 795 N.E.2d 385, 373, 342 Ill. App. 3d 365, 277 Ill. Dec. 18 (Ill. App. Ct. 5th Dist. 2003) (reversing the circuit court's grant of a motion to dismiss and stating, "because the agreement itself does not reveal the precise nature of the business purchased by the plaintiffs and what specific business activity the noncompetition clause sought to prohibit, we believe that this issue should not be determined by a motion to dismiss."). This court need not attempt to predict how the Illinois Supreme Court would resolve the split, however, because "[i]n a diversity action, the adequacy of the pleadings is assessed in accordance with the federal, not state, rules of civil procedure." *Franklin Capital Corp.* v. *Baker & Taylor Entertainment, Inc.*, 2000 WL 1222043, at *6 (N.D. Ill. Aug. 22, 2000); *see also Zurich American Ins. Co.* v. *Pillsbury Co.*, 264 F. Supp. 2d 710, 711 (N.D. Ill. 2003) ("As its lawyers must surely have been taught in Civil Procedure, a federal court sitting in diversity applies state substantive law, *Erie R.R. Co.* v. *Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), but federal procedural law. *See* Fed. R. Civ. P. 1 ('These rules govern the procedure in the United States district courts in all suits of a civil nature.')").

Because the court is required, under Illinois substantive law, to consider all of the facts and circumstances surrounding the covenant not to compete in this case, it would be inappropriate to determine its reasonableness on this Rule 12(b)(6) motion to dismiss. Among many other potentially relevant facts, the court has no information thus far regarding the number

and size of companies that compete with Integrated Genomics, the general size of the genome annotating industry, the existence of other jobs in defendants' field of expertise, or the nature of the relationships between Integrated Genomics and its clients. Furthermore, because the facts of the case are of such importance to the issue of reasonableness, the court could not find (as it would be required to in order to grant a motion to dismiss) that even making all reasonable inferences in favor of Integrated Genomics, it has not stated a claim for relief. In *Automed Tech., Inc.* v. *Eller*, 160 F. Supp. 2d 915, 923 (N.D. Ill. 2001), Judge Moran reached the same conclusion:

> Although Illinois views some restrictive covenants suspiciously as restraints on trade, it will enforce them to protect trade secrets. *Lawrence & Allen, Inc.* v. *Cambridge Human Resource Group, Inc.*, 685 N.E.2d 434, 443, 292 Ill.App.3d 131, 226 Ill. Dec. 331 (Ill. App. Ct. 2nd Dist. 1997). The clauses must be limited, both in duration and geographic range. *Id.* But these arguments go to the merits. They require the court to assess the restrictions' reasonableness, including the legitimacy of the employer's interests, what is necessary to protect them, and the employees' ability to still earn a living in their field. This is an inherently fact-based determination that is not appropriate at the motion to dismiss stage.[3]

Also in agreement was then-District Judge Williams in *Dunning* v. *Chemical Waste Management, Inc.*, 1993 WL 291842 (N.D. Ill. July 30, 1993) ("Thus, the court can only determine the hardship on the seller as well as the necessity of the restrictions based upon all of the facts and circumstances attendant to the sale of the business. Therefore, the reasonableness of the restrictive covenant in this case cannot be determined on the basis of the pleadings.").[4]

---

[3] Defendants' attempt to distinguish *Automated Tech* is not persuasive.

[4] In *Learning Curve Int'l, L.L.C.* v. *Chansons Du Kakawi, Inc.*, 1998 WL 565149, at *3 (N.D. Ill. Aug. 31, 1998), Judge Plunkett did grant a rule 12(b)(6) motion to dismiss on the basis that a covenant not to compete was unenforceable, but that case may be distinguished because the court focused not on the reasonability of the covenant, but on whether the covenantee had a protectible "legitimate business interest."

For these reasons, the court will deny the defendants' motion to dismiss as to the enforceability of the covenant not to compete. It does note, however, that Integrated Genomics will face an uphill battle on the merits because of how heavily the law weighs against covenants that are not limited in their geographical reach or their scope of prohibited activities. *See Telxon Corp.* v. *Hoffman*, 720 F. Supp. 657 (N.D. Ill. 1989); *Roberge* v. *Qualitek Int'l*, 2002 WL 109360 (N.D. Ill. Jan. 28, 2002); *Arcor* v. *Haas*, 842 N.E.2d 265, 363 Ill. App. 3d 396, 299 Ill. Dec. 526 (Ill. App. Ct. 1st Dist. 2005); *N. Am. Paper Co.* v. *Unterberger*, 526 N.E.2d 621, 172 Ill. App. 3d 410, 122 Ill. Dec. 362 (Ill. App. Ct. 1st Dist. 1988); *Dryvit System, Inc.* v. *Rushing*, 477 N.E.2d 35, 132 Ill. App. 3d 9, 87 Ill. Dec. 434 (Ill. App. Ct. 1st Dist. 1985). Although a lack of certain restrictions does not constitute *per se* unenforceability, this court has found no cases in its research that have enforced a covenant as broad as the one contained in Integrated Genomics' employment contract.[5][6]

---

[5] All of these considerations will also be relevant to the court's discretionary decision of whether or not to "blue-line" the covenant at issue here in order to enforce it in part. *See, e.g., Cambridge Eng'g*, 879 N.E.2d at 529; *Dryvit System*, 477 N.E.2d at 37-38.

[6] The parties also argue about whether Integrated Genomics' claim that Ivanova "solicit[ed] employees with whom she worked during her employment to work with her at the Joint Genome Institute," Amended Complaint, at ¶ 39, should be dismissed. Because this argument appears equally relevant to Kyrpides, the court addresses it here despite the fact that Ivanova will be dismissed from the case. Ivanova contends that it should be because under the terms of the employment agreement, the agreement was to expire on August 25, 2000 unless "extended by mutual agreement," and the activities that form the basis of the allegation occurred in 2004. She argues that because Integrated Genomics did not allege in its amended complaint that the agreement was so extended, its claim that she solicited employees during her term of employment fails as a matter of law. Integrated Genomics responds that "obviously the term was extended if Defendants continued to work [at Integrated Genomics] and accept paychecks and benefits, as is pled." Response, at 6. The court agrees that at the motion to dismiss stage, these allegations are sufficient. Whether or not the agreement was extended by mutual agreement is a question of fact that cannot be resolved against Integrated Genomics at this juncture.

**B.      Viability of Integrated Genomics' claims for breach of a duty of loyalty, tortious interference with prospective economic advantage, and common law unfair competition**

Integrated Genomics makes three claims in addition to its breach of contract claim: breach of a duty of loyalty, tortious interference with prospective economic advantage, and common law unfair competition.  Each are based on allegations that Kyrpides was privy to Integrated Genomics' proprietary information and that he left the company to work for its competitor, where he helped to develop a competing product and offered that product to Integrated Genomics' customers.  Kyrprides challenges each of these claims, arguing that Integrated Genomics fails to state its claims, the allegations are duplicative, and the claims are preempted by the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065 *et seq.*

1.      Count II – Breach of a duty of loyalty

Integrated Genomics alleges that Kyrpides "obtained extensive knowledge regarding the proprietary information, products, customer base and employee base of Integrated Genomics through the course of his employment with Integrated Genomics....  Upon information and belief, Kyrpides breached this duty [of loyalty] when in breach of his employment agreement he accepted a position at the Joint Genome Institute and took part in developing the IMG software which directly competes with Integrated Genomics' ERGO™ software."  Amended Complaint, at ¶¶ 55, 57.  It continues, "Kyrpides further breached this duty when he solicited Integrated Genomics employees to come work at The Joint Genome Institute while they were still Integrated Genomics employees."  Amended Complaint, at ¶ 58.  Integrated Genomics also incorporates all previous paragraphs of its amended complaint into Count II.

"During the course of employment, an employee owes an undivided duty of fidelity and loyalty to his employer." *RKI, Inc.* v. *Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001) (citation omitted). "An employee breaches a duty of loyalty to his employer when he takes advantage of knowledge and/or property acquired in the employer's business to make a profit for [himself] at the employer's expense." *Ladenberger* v. *General Signal Pump Group/Aurora Pump*, 2001 WL 709488, at *5 (N.D. Ill. June 22, 2001) (citation omitted).

Kyrpides argues that Count II should be dismissed for several reasons. First, he says, any fiduciary duty owed by an employee to an employer ceases with the termination of the employment relationship. This argument would not affect Integrated Genomics' allegation that Kyrpides solicited its employees to leave the company, because that may have occurred while Kyrpides was still employed by Integrated Genomics (as Integrated Genomics argues that it did). *See Automed*, 160 F. Supp. 2d at 925 ("Defendants move to dismiss the remaining fiduciary duty claims because those duties ceased when the employment relationship terminated. But the complaint includes allegations of wrongdoing while defendants still worked for AutoMed.... This adequately alleges disloyal action while the duty still applied."); *see also Riad* v. *520 S. Michigan Ave. Assoc. Ltd.*, 78 F. Supp. 2d 748, 763 (N.D. Ill. 1999) ("[I]n some circumstances, one under a fiduciary duty breaches the trust if he solicits his employer's customers or entices co-workers away from his employer."). Kyrpides seems to admit that Integrated Genomics' claim should survive to at least this extent when he states, "The only way in which IG's breach of fiduciary responsibility claim survives a Motion to Dismiss is to the extent IG is alleging (which is not stated) that Kyrpides solicited other IG employees while still employed at IG." Motion, at 8. Although Integrated Genomics did not explicitly allege the timing of the

solicitation in its complaint, on this motion to dismiss, the court must make all possible factual inferences in favor of Kyrpides. Therefore, the breach of duty of loyalty claim will survive at least to the extent of the solicitation allegations in paragraph 58.

As noted, Integrated Genomics also alleges that Kyrpides breached his duty of loyalty when he accepted a position at the Joint Genome Institute and took part in the development of IMG software. Integrated Genomics does not address Kyrpides's argument that any duty ceased to exist upon his departure. The court notes, however, that a restrictive covenant may create an ongoing fiduciary duty even after an employee leaves a company. *Jostens, Inc.* v. *Kauffman*, 842 F. Supp. 352, 354 (C.D. Ill. 1994) (citing, *inter alia*, *Composite Marine Propellers* v. *Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992)). Here, Kyrpides's employment agreement included a provision prohibiting him from disclosing Integrated Genomics' proprietary information "either during or after his employment." Complaint, Ex. A, at 4. Therefore, it is possible that Kyrpides had a continuing duty to protect Integrated Genomics' proprietary information even after he left the company.

Kyrpides argues that the allegation that he breached a duty of loyalty after leaving Integrated Genomics must be dismissed according to Judge Zagel's rationale in *Teradyne, Inc.* v. *Clear Communications Corp.*, 707 F. Supp. 353 (N.D. Ill. 1989). In that case, the plaintiffs claimed misappropriation of trade secrets under the Illinois Trade Secrets Act. *Id*. at 353, 355. The defendants were former employees of the plaintiff who allegedly had knowledge of its trade secrets. *Id*. at 354-55. They started a new company that would be in direct competition with the plaintiff, and the plaintiff feared that the defendants were likely to disclose its secrets. *Id*. at 355. The plaintiff did not, however, allege that the defendants had threatened to disclose its secrets or

18

that the operation of their new business would require that they do so.  *Id*. at 356-57.  The court therefore concluded that the complaint had to be dismissed, explaining, "The defendants' claimed acts, working for [plaintiff], knowing its business, leaving its business, hiring employees from [plaintiff] and entering the same field ... do not state a claim of threatened misappropriation.  All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will.  This is not enough."  *Id*. at 357.

Integrated Genomics has two responses to Kyrpides's citation of *Teradyne*.  First, it contends that *Teradyne* has been "negatively treated" and "substantially overruled," Response, at 7, by a later decision: *Strata Marketing, Inc.* v. *Murphy*, 740 N.E.2d 1166, 317 Ill. App. 3d 1054, 251 Ill. Dec. 595 (Ill. App. Ct. 1st Dist. 2000).  *Strata*, however, did *not* overrule *Teradyne*, but merely distinguished it; the court there said, "Strata's allegations are not like those in *Teradyne* where the plaintiff simply alleged that the defendant had information and Teradyne was fearful that the defendant would use it."  740 N.E.2d at 1179.  Integrated Genomics' second argument is that "trade secret theft has not currently been pled in the present action."  Response, at 7.  This leads the court to Kyrpides's argument that the Illinois Trade Secret Act ("ITSA"), 765 Ill. Comp. Stat. 1065 *et seq.*, preempts Integrated Genomics's breach of duty of loyalty claim to the extent that it alleges misuse of proprietary information.  Integrated Genomics does not address this argument at all, so the court is left with its own research and the few citations provided by Kyrpides.

ITSA says that it is "intended to displace competing tort, restitutionary, unfair competition, and other laws of this state providing civil remedies for misappropriation of a trade secret."  765 Ill. Comp. Stat. 1065/8.  It defines a "trade secret" as follows:

"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.[7]

765 Ill. Comp. Stat. 1065/2. It defines "misappropriation" as follows:

"Misappropriation" means: ... disclosure or use of a trade secret of a person without express or implied consent by another person who ... at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...."[8]

In support of his argument for ITSA preemption of Integrated Genomics' duty of loyalty claim, Kyrpides relies exclusively on Northern District of Illinois cases issued before the more recent and important case of *Hecny Transportation, Inc.* v. *Chu*, 430 F.3d 402 (7th Cir. 2005). As Judge Grady said in *RTC Indus.* v. *Haddon*, 2007 WL 2743853, at *3 (N.D. Ill. Sept. 10, 2007), "*Hecny* departs from the broad preemptive effect applied in ... prior cases. After *Hecny*, the test for a non-ITSA claim is not whether the plaintiff arguably could have brought an ITSA claim. Rather, the test is whether the plaintiff's claim would lie if the information at issue were non-

---

[7] Illinois courts typically consider six factors in applying the statute: "(1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known to employees and others involved in the employer's business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the money or effort expended by the employer in developing the information; and (6) the ease or difficulty with which others might properly acquire or duplicate the information." *Lawson Prods., Inc.* v. *Chromate Indus. Corp.*, 158 F. Supp. 2d 860, 864 (N.D. Ill. 2001).

[8] "To state a claim for misappropriation of a trade secret, the complaint must allege that information was (1) a trade secret, (2) misappropriated and (3) used by defendant." *Lawson*, 158 F. Supp. 2d at 863-64 (citing *Composite Marine Propellers, Inc.* v. *Van Der Woude*, 962 F.2d 1263, 1265-66 (7th Cir.1992)).

confidential." Therefore, the liberal preemption doctrines stated in cases like *Fox Controls, Inc.* v. *Honeywell, Inc.*, 2002 WL 1949723, a *3 (N.D. Ill. Aug. 22, 2002) ("if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois"), have been called into serious question by *Hecny* and can no longer be cited as the unequivocal law in this circuit.[9]

Integrated Genomics has not yet identified exactly what proprietary information it alleges that Kyrpides has disclosed, but it is not necessary for it to do so in its complaint. *Automed*, 160 F. Supp. 2d at 921. Its definition of "proprietary information" is very similar to ITSA's definition of a "trade secret." While Integrated Genomics cannot protect confidential information to the extreme of preventing its employees from being able to function after leaving its employ, *Delta Med. Sys.* v. *Mid-Am. Med. Sys., Inc.*, 772 N.E.2d 768, 793, 331 Ill. App. 3d 777 (Ill. App. Ct. 1st Dist. 2002), it may be able to protect more than what would fit into the strict definition of a trade secret. For these reasons, the court cannot determine on this motion to dismiss whether Integrated Genomics' breach of duty of loyalty claim based on disclosure of

---

[9] The Seventh Circuit explained that the more liberal preemption rules lead to an unreasonable result in cases where the allegedly proprietary information might ultimately be determined not to be a trade secret. *Hecny*, 430 F.3d at 404-05. It discussed with approval the Uniform Law Commissioners' comment to the Uniform Trade Secrets Act of 1985, on which ITSA is based: "'The [preemption provision] does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal.'" *Id.* at 405. It continued with an example, "An assertion of a trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record." *Id.*

All of this is not necessarily to say that a duty of loyalty claim could never be preempted by ITSA, however. As the court noted in *RTC Indus.*, 2007 WL 2743583, at *3, claims will still be foreclosed when they rest on the conduct that is said to misappropriate trade secrets. "Accordingly, there are still some situations where the ITSA will preempt a fiduciary-duty claim." *Id.*

proprietary information would be preempted by ITSA. *See Universal Imagine Print Group, LLC*, v. *Mullen*, 2008 WL 62205, at *2 (N.D. Ill. Jan. 4, 2008) (holding that 12(b)(6) dismissal was not appropriate where a company's contractual definition of confidential information was broader than the statutory definition of trade secrets and stating, "If the information does not qualify as a trade secret, the availability of civil remedies designed to address unlawful disclosure or use would be unaffected by ITSA [preemption].").

This allegation of breach of a duty of loyalty is arguably duplicative of Integrated Genomics' breach of contract claim. At this point, however, the court declines to strike the duty of loyalty claim on that basis. It is possible that the breach of contract claim may be challenged again at a later point, such as on a motion for summary judgment, at which point the court can reevaluate the issue of duplicity. Count II will therefore not be dismissed at this juncture.

2.      Count III – Tortious interference with prospective economic advantage

Integrated Genomics' tortious interference with prospective economic advantage claim alleges as follows:

> 65. Integrated Genomics hereby repeats and realleges the allegations of paragraphs 1-64 above, as though fully set forth herein.

> 66. Kyrpides and Ivanova obtained extensive knowledge regarding the customers and employee base of Integrated Genomics through the course of their employment with Integrated Genomics.

> 67. With this knowledge, Kyrpides and Ivanova were able to offer Integrated Genomics customers a competing product which had been developed in violation of Kyrpides and Ivanova's Employment Agreements.

> 68. As a result of Kyrpides and Ivanova's actions, Integrated Genomics has suffered money damages in the form of lost business, lost goodwill, and lost profits.

Amended Complaint, at ¶¶ 65-68.

Kyrpides argues that this count must be dismissed because it is preempted by ITSA, because it is duplicative of the breach of contract claim, and because Integrated Genomics has failed to state a claim for tortious interference with prospective economic advantage. ITSA does not warrant dismissal of this count for similar reasons as those stated above with respect to Count II. The court will not dismiss this count as duplicative at this time because of the possibility that the breach of contract claim will be challenged again in the future. Therefore, the court will move on to consider the argument that Integrated Genomics has failed to state a claim.

"Under Illinois law, to state a claim for tortious interference with prospective economic advantage, plaintiffs must allege that: (1) the plaintiff had a reasonable expectation of entering into a valid business relationship; (2) the defendants knew of this expectancy; (3) the defendants intentionally and unjustifiably interfered to prevent the expectancy from being fulfilled; and (4) damages." *Kim* v. *Kim*, 360 F. Supp. 2d 897, 904 (N.D. Ill. 2005); *see also Conditioned Ocular Enhancement, Inc.* v. *Bonaventura,* 458 F. Supp. 2d 704, 712 (N.D. Ill. 2006); *Russian Media Group, LLC* v. *Cable America, Inc.*, 2008 WL 360692, at *5 (N.D. Ill. Feb. 7, 2008). Integrated Genomics points out that it alleged "that Defendants obtained extensive knowledge regarding the customers and employee base of Integrated Genomics through the course of their employment with Integrated Genomics. They violated their employment Agreements by developing a competing product, and then they went and offered it to IG's customers. IG was then damaged by losing customers and potential customers.... [C]ustomers are obviously valid business relationships." Response, at 8.

Integrated Genomics alleges that it has generally lost customers as a result of Kyrpides offering those customers a competing product, which is sufficient to survive a motion to dismiss. *Russian Media Group*, 2008 WL 360692, at *5 (finding it sufficient that plaintiff had alleged that "certain customers have terminated their contractual relationships with Plaintiff to subscribe to Defendants' service"); *see also Kim* v. *Kim,* 360 F. Supp. 2d at 904-05 (same). Because Integrated Genomics has alleged elsewhere in the amended complaint that it was wrongful for Kyrpides to leave the company to work for the Joint Genome Institute and use Integrated Genomics' proprietary information to develop a competitive product, it has also satisfactorily alleged that his actions were intentional and unjustifiable. Therefore, this claim will not be dismissed.

3.	Count IV – Unfair Competition

Integrated Genomics' unfair competition claim repeats verbatim the allegations of its tortious interference with prospective economic advantage claim. Kyrpides argues that it should be dismissed because it is preempted by ITSA and because Integrated Genomics has failed to state a claim for unfair competition. As with the previous claims, ITSA does not warrant dismissal of Count IV at this point.

Kyrpides cites *Day-Bright Lighting, Inc.* v. *Sandee Mfg. Co.*, 286 F.2d 596 (7th Cir. 1960), for the proposition that "[i]n order to make a claim for unfair competition, the plaintiff must prove that defendant represented goods as those of the plaintiff or that the public has been deceived into the belief that the defendant's design emanated from the same source as plaintiff." Motion, at 11. The court has reviewed *Day-Bright*, however, and it is clear that the Seventh Circuit was not attempting to state the requirements for a general unfair competition claim under

Illinois common law. Instead, the court was discussing unfair competition in the context of a federal patent infringement lawsuit and did not discuss Illinois state law at all.

Kyrpides cited only *Day-Bright* on this point and Integrated Genomics did not cite any cases at all.[10] But according to the court's research, it would be inappropriate to dismiss Count IV. In Illinois, the common law tort of unfair competition encompasses a "broad spectrum of law" and it is difficult to determine exactly what elements are required in order to prove such a claim. *Zenith Elec. Corp.* v. *Exzec, Inc.*, 1997 WL 223067, at *6 (N.D. Ill. March 27, 1997) (adopting the report and recommendation of Magistrate Judge Lefkow). The principal form of the tort "as it applies to circumstances arising from alleged interference with third party relations[] apparently falls under the rubric of tortious interference with prospective economic advantage." *Id*; *see also Hycor Corp.* v. *Dontech, Inc., et al.*, 1985 WL 3604, at *2 (N.D. Ill. Oct. 31, 1985) ("Defendants' contention that a likelihood of confusion as to source must be pled

---

[10] In fact, the entirety of Integrated Genomics' response to Kyrpides's motion to dismiss Count IV was as follows:

> Finally, Defendants argue that they do not understand, Count IV, relating to Common Law Unfair Competition. They go on to describe the allegations contained in the Complaint as "point[ing] to the Defendants' Employment Agreements and say[ing] virtually nothing more." (Deft. Brf. At 11). Once again, Defendants characterization of the Amended Complaint is incorrect. The Amended Complaint states at ¶ 71, that Defendants developed a competing product in violation of their Employment Agreements, with the knowledge they had acquired from their employment at IG. Defendants go on to state that nothing suggests defendants have marketed or sold anything. (Deft. Br. At 12). Again, this is incorrect. Paragraph 68 of the Amended Complaint, realleges and incorporates the previous paragraphs. Paragraph 67 contains the allegations that Defendants offered the competing product which was developed in violation of their Employment Agreements.

Response, at 9.

to state a claim for unfair competition is erroneous.").  Furthermore, a plaintiff may plead both tortious interference with prospective economic advantage and unfair competition.  *Gorgonz Group, Inc.* v. *Gray Matter Holdings, LLC*, 2001 WL 103406, at *4 (N.D. Ill. Jan. 30, 2001). Therefore, Count IV will not be dismissed.

## IV.     Conclusion and Order

For the foregoing reasons, defendants' motions to dismiss [#31, #33] are granted in part and denied in part, in that Ivanova is dismissed from this case, but defendants' motions to dismiss Counts I-IV of the complaint are denied.


DATED: March 4, 2008             ENTER:  _____
                                              JOAN HUMPHREY LEFKOW
                                              UNITED STATES DISTRICT JUDGE