**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTEGRATED GENOMICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 06 C 6706 |
| | ) | |
| v. | ) | Judge Joan H. Lefkow |
| | ) | |
| NIKOS KYRPIDES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Integrated Genomics, Inc. ("Integrated") filed a four-count amended complaint against

Nikos Kyrpides alleging (1) breach of contract, (2) breach of fiduciary duty, (3) tortious

interference with prospective economic advantage, and (4) common law unfair competition.[1]

Kyrpides counterclaimed, alleging (1) breach of contract, (2) violations of the Illinois Wage

Payment and Collection Act ("IWPCA"), 820 Ill. Comp. Stat. § 115/1 *et. seq.*, and (3) breach of

promissory note.  Pending before the court are both parties' motions for summary judgment and

Integrated's motion to strike.  Integrated seeks summary judgment on the first three counts of its

complaint, Kyrpides's affirmative defenses, and Kyrpides's counterclaims.  Kyrpides seeks

summary judgment on all four counts of Integrated's complaint and on his breach of promissory

note counterclaim.  For the following reasons, Integrated's motion for summary judgment [#177]

and its motion to strike [#208] are granted in part and denied in part, and Kyrpides's motion for

summary judgment [#180] is granted in part and denied in part.

---

[1] The court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332 as discussed in its
Memorandum Opinion and Order of March 4, 2008.  *See* Dkt. No. 69 at 4–11.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## BACKGROUND[2]

Integrated, a Delaware corporation with its principal place of business in Chicago, Illinois, develops software for analyzing genomes and undertakes such analyses itself. It has

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at 9–11.

customers throughout the United States and internationally.  In August 1999, Integrated hired

Kyrpides as an annotator of its ERGO™ bioinformatics software.  Over the course of his

employment, Integrated ultimately promoted Kyrpides to Director of Bioinformatics.  Kyrpides

resigned from Integrated in April 2004 to take a job with the Joint Genome Institute ("JGI") in

California.

## I.      Kyrpides's Employment Agreement

On August 19, 1999, Kyrpides and Integrated executed an employment agreement.  The

agreement defined Kyrpides's employment period as "commencing on August 17, 1999 (the

'Commencement Date') and ending on August 16 (such period, as it may be extended, the

'Employment Period'), unless sooner terminated in accordance with the provisions of Section 4."

Ex. 2 to IG's L.R. 56.1 Stmt. at § 4 (hereinafter "Employment Agreement").  Section 4 provided,

among other things, that either party could terminate the employment relationship without cause

by providing thirty days written notice.  Kyrpides agreed to an annual base salary of $84,000 for

his first year of employment and to having subsequent adjustments determined by Integrated's

president.[3]  The employment agreement contained a covenant not to compete and not to disclose

proprietary information:

> 6.      Non-Compete.
>
> (a)      During the Employment Period and for a period of two years after the
> termination or expiration thereof, the Employee will not directly or indirectly:
>
> (I)      as an individual, proprietor, partner, stockholder, officer, employee,
> director, joint venturer, investor, lender, or in any other capacity whatsoever
> (other than as the holder of not more than one percent (1% ) of the total

---

[3] Although the agreement attached to the complaint and submitted as an exhibit by the parties to their Local Rule 56.1 Statements does not include a number for Kyrpides's starting salary, Kyrpides admits it.

outstanding stock of a publicly held company), engage in the business of developing, producing, marketing or selling products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed, or sold by the Company, or planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while the Employee was employed by the Company; or

(ii)     recruit, solicit or induce, or attempt to induce, any employee or employees of the Company to terminate their employment with, or otherwise cease their relationship with, the Company; or

(iii)     solicit, divert, or take away, or attempt to divert or take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served by the Employee while employed by the Company.

(b)     If any restriction set forth in this Section 6 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(c)     The restrictions contained in this Section 6 are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose.  The Employee agrees that any breach of this Section 6 will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

7.     Proprietary Information and Developments.

7.1     Proprietary Information.

(a)     Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company.  By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, and customer and supplier lists.  Employee will not disclose any Proprietary Information to others outside the Company or use the same for

any unauthorized purposes without written approval by an officer of the
Company, either during or after his employment, unless and until such Proprietary
Information has become public knowledge without fault by the Employee.

Employment Agreement §§ 6–7.1(a). This 1999 employment agreement is the only written

contract Kyrpides entered into during his employment at Integrated.

## II. Integrated's Financial Difficulties

In August 2001, Kyrpides's annual salary was $91,000. In October 2001, to address

financial difficulties, Integrated instituted a ten percent pay reduction for all employees,

including Kyrpides. A letter was circulated to all employees explaining this action and

requesting their agreement to it. Although no document with Kyrpides's signature has been

tendered, Kyrpides has admitted that he agreed to the reduction and also to accept delayed

paychecks. The pay reduction was only temporary, and in fall 2002, Kyrpides's annual salary

was increased to $120,000. Kyrpides also agreed to accept late paychecks as Integrated was still

having financial difficulties. Between 2002 and 2004, Integrated issued paychecks that were

over sixty days late on more than one occasion. In October 2003, Kyrpides, along with several

other employees, wrote to Dr. Andres Schulze, head of one of Integrated's main investors, to

advise him of Integrated's financial difficulties and delayed paychecks. Despite these delays and

complaints, Kyrpides did receive payment for each pay period of his employment with

Integrated, receiving his final check on June 3, 2004, over a month after his resignation.

## III. Events Leading up to Kyrpides's Resignation from Integrated

In October 2003, Kyrpides interviewed for a position at JGI, a project of the Lawrence

Berkeley National Laboratory operated by the Regents of the University of California. During

his interview, Kyrpides indicated that several other Integrated employees would also be

interested in applying to JGI and joining him there. On December 19, 2003, JGI offered Kyrpides a position as a biologist staff scientist in JGI's Microbial Genome Analysis Program.

On February 26, 2004, Kyrpides wrote to Roelf Datema, Integrated's chief executive officer, advising him that he was resigning and expected to leave in mid-April but noting that he had not yet accepted any other position. Kyrpides testified that he accepted the JGI position the following day. He left Integrated on April 20, 2004. In negotiating his last day of employment – April 20, 2004 – Kyrpides relied on the provisions of his 1999 employment agreement, claiming that premature termination would entitle him to severance.

In March 2004, prior to Kyrpides's departure from Integrated but after he had accepted the JGI position, he wrote a letter of recommendation to JGI on behalf of Natalia Ivanova, a fellow Integrated employee. Ivanova accepted a position at JGI on March 27, 2004 and left Integrated on May 12, 2004. In an annual supplement to his professional resume for 2004 and 2005, Kyrpides listed as one of his achievements "identify[ing] and recruit[ing] a group of world experts in microbial genome analysis and metabolic reconstruction" and included Ivanova in this group. Ex. 17 to Integrated's L.R. 56.1 Stmt. Despite this statement, Kyrpides testified that he attempted to persuade Ivanova to stay at Integrated after he accepted his position at JGI, but that Ivanova told him that "'[t]here is nothing that would make me stay. I am determined to leave, and I'm looking for alternative positions.'" Ex. 3 to Integrated's L.R. 56.1 Stmt at 340:8–16, hereinafter "Kyrpides Dep." Ivanova has stated that she left Integrated for financial and emotional reasons, as the reduced pay and delayed paychecks she received from Integrated between 2001 and 2004 made it difficult for her to provide for her two children and parents, ultimately forcing her to leave her children in Russia with her parents while she sought more

6

financially stable employment in the United States.

In his resignation letter, Kyrpides stated that Integrated would suffer as a result of his resignation, as replacing any microbiologist or biochemist in his group would take between six and twelve months, but replacing him or Ivanova would "evidently take much longer." Ex. B to Am. Compl. Integrated has estimated that had it hired a qualified replacement for Ivanova, the cost would have been between $30,000 to $40,000 in employee time and recruiter fees, and that approximately $76,000 to $100,000 in salaried time would have to be spent before this replacement became profitable. Integrated did not, however, endeavor to hire a replacement for Ivanova. Instead, it relied on other staff to cover Ivanova's workload. In 2007, Integrated began to outsource Ivanova's work to a company in India. Integrated also considers nearly $4,000 in legal and other fees to obtain a visa for Ivanova in 1999 part of the investment it lost as a result of Ivanova's departure.

## IV.    Kyrpides's Employment at JGI

At JGI, Kyrpides joined its genome biology program. His responsibilities included developing new tools, methods, and software to improve the annotation and analysis of microbial genomes. He initially sought to obtain a license to Integrated's ERGO™ database for JGI's use but was ultimately unsuccessful. JGI instead developed its own database, IMG, which is an ERGO™ competitor. Kyrpides contributed to IMG's development.[4] Kyrpides also maintained contact with Integrated's employees, collaborating with two of them, Victor Joukov and Denis Kaznadzey, on JGI projects. Kyrpides emailed Joukov in early May 2004 about Operons, a

---

[4] Kyrpides maintains that he only provided scientific guidance for the IMG database and did not help in the development of the source code or methodology.

research project Integrated had once considered pursuing, and told Joukov not to reveal anything to Integrated regarding his work on it. Kyrpides also told Joukov he was irreplaceable and should find a job with JGI as soon as possible. In June 2004, Kyrpides put Joukov and Kaznadzey in touch with a researcher at Argonne National Laboratories to discuss protein cluster data and other potential collaborations that Kyrpides thought might be of benefit to him. At Kyrpides's request, Kaznadzey also provided critiques of the IMG system. During this time, Kaznadzey visited JGI several times for interviews and ultimately was offered a position there. Kaznadzey declined JGI's offer in part because it was not for a group leader position.

## V.        Integrated's Promissory Note

When Kyrpides left Integrated, Integrated executed a promissory note to Kyrpides for $57,000. The note was for a license to the GOLD database Kyrpides developed prior to working at Integrated. Integrated was to make payments in eighteen monthly installments of $3,166.67 each. Interest was to accrue at 1.5% per month but was abated as long as Integrated made its monthly payments on a timely basis. If Integrated defaulted by failing to pay on the first of each month, upon receiving written notice from Kyrpides, it was required to pay interest accruing from May 1, 2004 until the note was fully paid. Integrated paid the fourteenth installment, due on June 1, 2005, on July 20, 2005. It paid the sixteenth installment, due on August 1, 2005, on September 9, 2005. The seventeenth installment, due on September 1, 2005, was paid on September 26, 2005. Integrated did not tender the eighteenth installment, due on October 1, 2005, until January 27, 2006. Prior to this date, on December 5, 2005, Kyrpides emailed John Elling, Integrated's president, notifying him that Integrated had defaulted on the note and thus must pay interest accruing from May 1, 2004 within seven days, as provided in the promissory

note.  Elling responded that Integrated's cash flow situation meant it could not pay at that time

but would do so shortly.  To accompany its final payment on January 27, 2006, Elling wrote to

Kyrpides, thanked him for his patience in accepting late payments, and disputed that Integrated

was in default and that interest was due under the note.  Integrated's check was for $3,352.47,

the sum of the final principal payment and $143.68 in interest for the period between October 1,

2005 to January 27, 2006.  Elling noted that Integrated felt "it fair and appropriate that [it] pay

some amount of interest on this late payment."  Ex. 24 to Integrated's L.R. 56.1 Stmt.  The check

and letter both stated that the check was tendered as payment in full of all amounts owed under

the promissory note.  On February 7, 2006, Kyrpides's attorney responded to Elling, contending

that Integrated was in default but agreed to accept the final payment and waive the interest due if

Integrated paid $500 in attorney's fees.   Although Integrated never paid the attorney's fees,

Kyrpides cashed Integrated's final payment.

## DISCUSSION

## I.       Integrated's Motion to Strike

Before reaching the merits of the parties' motions for summary judgment, the court will

address certain deficiencies in the parties' Local Rule 56.1 Statements and Responses.  Local

Rule 56.1(a) requires the party seeking summary judgment to submit, among other things, a

statement of material facts, which consists of short, numbered paragraphs and specific references

within each paragraph to the affidavits, parts of the record, and other supporting materials relied

upon to support the facts set forth in each paragraph.  L.R. 56.1(a)(3).  The non-moving party

must then submit a concise response to the movant's statement of facts.  L.R. 56.1(b)(3).

Material facts improperly denied by the non-moving party are deemed admitted by the court.  *Id.*

Integrated filed a motion to strike certain responses contained in Kyrpides's response to its Local Rule 56.1 Statement of Uncontested Facts and his reply to its Statement of Additional Facts, along with Kyrpides's and Kaznadzey's affidavits. In his responses to Integrated's Local Rule 56.1 Statement, Kyrpides also asks the court to strike certain paragraphs he argues are unsupported.

The court agrees with Integrated that Kyrpides's responses to ¶¶ 8, 10, 16, 17, 21, 29, 30, 32, 33, 34, 35, 37, and 42 of Integrated's Local Rule 56.1 Statement of Uncontested Facts and ¶¶ 1, 3, 5, 8, 9, 10, 13, 14, 15, 16, 24, 32, 33, 35, 36, 39, 41, 45, 46, 48, 54, and 57 of Integrated's Statement of Additional Facts are improper because they are not properly supported with citations to the record, are argumentative, or are narrative admissions. *See Cady* v. *Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006) (explaining that it is inappropriate to make legal arguments in Rule 56.1 statements and responses); *Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). Because the court is entitled to expect strict compliance with Local Rule 56.1 procedures, *Ammons* v. *Aramark Unif. Servs, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), it deems these paragraphs admitted. *See Smith*, 321 F.3d at 683 (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."); *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) (ruling that district court acted within its discretion in granting summary

judgment to defendant based on plaintiff's failure to comply with Local Rule 56.1). Because Integrated failed to properly support ¶ 15 of its Local Rule 56.1 Statement and ¶¶ 12 and 21 of its Statement of Additional Facts, the court will not consider these paragraphs. The court also finds Kyrpides's second affidavit, DX 145, attached to Kyrpides's Response to Integrated's Motion for Summary Judgment, to be improper because it is argumentative and contains opinions on legal conclusions. The court will not consider this affidavit in ruling on the present motions for summary judgment.

## II. Breach of Contract

### A. Choice of Law

To analyze the enforceability of the restrictive covenants contained in the employment agreement, the court must first determine whether Illinois or California law will govern the interpretation of the parties' agreement. In a diversity case, this court applies the choice of law rules of the forum state to determine which state's substantive law governs the contract. *Klaxon Co.* v. *Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941). Illinois follows the Second Restatement, which provides that a contract's choice-of-law clause will be respected unless (1) the chosen state has no substantial relationship to the parties or the transaction or (2) the application of the chosen law would be contrary to a fundamental public policy of a state with a materially greater interest and that state's law would be applied absent a choice-of-law clause. *Brown & Brown, Inc.* v. *Mudron*, 887 N.E.2d 437, 439–40, 379 Ill. App. 3d 724, 320 Ill. Dec. 293 (Ill. App. Ct. 2008); *see also Fulcrum Fin. Partners* v. *Meridian Leasing Corp.*, 230 F.3d 1004, 1011 (7th Cir.2000) ("Illinois respects the contract's choice-of-law clause as long as the contract is valid and the law chosen is not contrary to

Illinois's fundamental public policy.").

The employment agreement provides that Illinois law governs. Kyrpides contends, however, that California law should apply because California has a strong public policy against non-competition agreements, as evidenced by Section 16600 of the California Business and Professions Code. *See* Cal. Bus. & Prof. Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."). Although Illinois generally also views covenants not to compete as agreements in restraint of trade and thus contrary to public policy, Illinois courts will find them valid and enforceable if "'reasonable and necessary to protect a legitimate business interest of the employer.'" *Cambridge Eng'g, Inc.* v. *Mercury Partners 90 BI, Inc.*, 879 N.E.2d 512, 522, 378 Ill. App. 3d 437, 316 Ill. Dec. 445 (Ill. App. Ct. 2007) (quoting *Lawrence & Allen, Inc.* v. *Cambridge Human Res. Group, Inc.*, 658 N.E.2d 434, 441, 292 Ill. App. 3d 131, 226 Ill. Dec. 331 (Ill. App. Ct. 1997)). Thus, because Illinois law requires the court to evaluate the reasonableness of the covenant instead of automatically invalidating it, a conflict exists between the two states' laws. This does not, however, mean that the parties' choice of law will be overridden, for California does not have a materially greater interest in this dispute than Illinois, and California law would not apply to this dispute absent the choice-of-law clause. Integrated, with its principal place of business in Illinois, negotiated and entered the agreement with Kyrpides, then an Illinois resident, in Illinois. Kyrpides performed the contract in Illinois until his resignation. California's only connection to this dispute is as Kyrpides's residence after leaving Integrated's employ. Because Illinois, not California, has the most significant relationship to the contract and the parties, the court will apply Illinois law to the

breach of contract claim despite California's strong public policy against covenants not to compete.[5]

### B.     Enforceability of the Employment Agreement

Kyrpides claims that Integrated cannot enforce the employment agreement because it does not contain an end date or, alternatively, because the agreement expired.[6]  It is true that the employment agreement contains a start date but fails to include a complete end date.  The employment agreement omits the year, stating that the employment period is from "August 17, 1999 to August 16," with the potential for extension.  Employment Agreement § 1.  The agreement created an at-will employment relationship, for either party had the right to terminate employment without cause upon thirty days notice.  Thus, the lack of an end date does not make the agreement unenforceable but only establishes that Kyrpides was an employee at will, as recognized by both parties.  While this means that neither party could maintain a breach of contract action for improper termination, the remaining terms of the agreement can be enforced by either party.  *See Kamboj* v. *Eli Lilly & Co.*, 2007 WL 178434, at *5–6 (N.D. Ill. Jan. 18, 2007) ("[T]he Court agrees with Plaintiff that she may assert a claim for breach of the other terms or conditions of her at-will employment contract, even though she would not be able to assert a claim for termination of that contract . . . ."); *Czapla* v. *Commerz Futures, LLC*, 114 F.

---

[5] Illinois law would apply to the non-solicitation provision regardless of the outcome of the most significant relationship analysis, as no conflict exists between California's and Illinois's public policy on the issue.  California courts have found that such non-solicitation provisions are valid and enforceable and do not violate Section 16600.  *See Loral Corp.* v. *Moyes*, 219 Cal. Rptr. 836, 844 (Cal. Ct. App. 1985).  Thus, applying Illinois law as provided in the contract to evaluate the reasonableness of the non-solicitation covenant does not contradict California's established public policy.

[6] Although Kyrpides initially argues that the employment agreement also fails to contain a specified salary, in his reply, he withdraws this argument, acknowledging that the salary term was redacted from the agreement tendered to the court.

Supp. 2d 715, 720 (N.D. Ill. 2000) ("[A]n employee can still demand the promised benefits under an at-will agreement with his employer even though that employee cannot enforce its employment provision. . . . [A]n 'at-will' contract is still a contract with binding terms." (citations omitted)).

Even if the court credited Kyrpides's alternate argument that the contract was intended to last one or two years after which he became an employee at will, Kyrpides's continued employment is sufficient for the court to presume that the original contract terms continued in force. *Foster* v. *Springfield Clinic*, 410 N.E.2d 604, 607, 88 Ill. App. 3d 459, 43 Ill. Dec. 604 (Ill. App. Ct. 1980) ("'It has been repeatedly held that, where one party enters the employment of another under a special contract fixing the time and price to be paid, and continues in such employment after the term has elapsed, it will be presumed that the hiring and service were under the original contract.'" (quoting *Crane Bros. Mfg. Co.* v. *Adams*, 30 N.E. 1030, 1032, 142 Ill. 125 (Ill. 1892))); *see also Melena* v. *Anheuser-Busch, Inc.*, 847 N.E.2d 99, 109, 219 Ill. 2d 135, 301 Ill. Dec. 440 (Ill. 2006) ("[U]nder Illinois law, continued employment is sufficient consideration for the enforcement of employment agreements."). Thus, the court finds that the employment agreement is valid and enforceable as a whole.[7]

### C. Enforceability of the Restrictive Covenants

Illinois courts closely scrutinize covenants not to compete as they are restraints on trade.

---

[7] Kyrpides has asserted as his second affirmative defense that there was no consideration for the contract. As noted, this defense fails, for Illinois courts have generally held that continued employment of two years or more is sufficient consideration for a restrictive covenant in an employment agreement to be enforceable. *See Brown & Brown, Inc.*, 887 N.E.2d 437, 440. Kyrpides worked for Integrated for almost five years before leaving in April 2004. Thus, Integrated's motion for summary judgment on Kyrpides's second affirmative defense will be granted.

*Cambridge Eng'g, Inc.*, 879 N.E.2d at 522; *The Agency, Inc.* v. *Grove*, 839 N.E.2d 606, 613–14, 362 Ill. App. 3d 206, 298 Ill. Dec. 283 (Ill. App. Ct. 2005). A restrictive covenant is only valid and enforceable if the terms are "reasonable and necessary to protect a legitimate business interest of the employer." *Cambridge Eng'g, Inc.*, 879 N.E.2d at 522 (quoting *Lawrence & Allen, Inc.*, 658 N.E.2d at 441). The terms (1) must not be greater than necessary to protect the employer, (2) must not be oppressive to the employee, and (3) must not injure the general public. *Liautaud* v. *Liautaud*, 221 F.3d 981, 987 (7th Cir. 2000) (collecting Illinois cases). Whether a restrictive covenant is reasonable is a question of law to be decided by the court. *Id.* at 986. The court must consider the propriety of the restrictions in terms of their length in time, their territorial scope, and the activities they restrict. *Cambridge Eng'g, Inc.*, 879 N.E.2d at 522. Reasonableness cannot be determined in the abstract, however, and it necessarily depends on the unique facts and circumstances of each case. *Liautaud*, 221 F.3d at 987. The employer bears the burden of establishing that the full extent of the restriction is necessary to protect its interests. *Cambridge Eng'g, Inc.*, 879 N.E.2d at 522.

1. *Non-Compete*

As set out above, Kyrpides signed a covenant not to compete that provided that he would not

> engage in the business of developing, producing, marketing or selling products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed, or sold by the Company, or planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while the Employee was employed by the Company[.]

Employment Agreement § 6(a)(1). Renewing the argument made in his motion to dismiss, Kyrpides claims this provision is unenforceable because it is beyond what is necessary to protect

Integrated's legitimate business interest, unlimited in scope and geography, and overly oppressive. In Kyrpides's opinion, the covenant would prevent him from earning a living in the field, even as a janitor for a company in the genome industry. He further claims that it is so broad that he could violate it inadvertently, since the restriction extends to products and services "planned to be produced, marketed or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while the Employee was employed by the Company," which he may not be aware of. Employment Agreement § 6(a)(1). Integrated, however, contends that the provision does not prevent or restrict Kyrpides from working for a competitor in any capacity, that it is necessary to protect its confidential information, and that the court may modify the restrictions of the covenant if it finds them to be too broad.

As the court noted in its opinion on Kyrpides's motion to dismiss, Integrated faces an "uphill battle on the merits because of how heavily the law weighs against covenants that are not limited in their geographical reach or their scope of prohibited activities." *Integrated Genomics, Inc.* v. *Kyrpides*, No. 06 C 6706, 2008 WL 630605, at *8 (N.D. Ill. Mar. 4, 2008). Integrated has not met its burden of establishing that the covenant not to compete is necessary to protect its interests. It has presented no evidence of the size of companies that compete with Integrated, the general size of the annotating industry, the existence of other jobs in Kyrpides's field of expertise, or the nature of its relationships with its clients, all of which the court indicated would be necessary to determine the reasonableness of the covenant. *See id.* at *7. Integrated has not demonstrated that it has a legitimate interest in protecting its confidential information. On the record before it, the court is left to conclude that the covenant not to compete is a blanket

prohibition on competition, overly broad and beyond that necessary to protect Integrated's legitimate business interests.

While the court may in its discretion modify a covenant where it finds the terms to be too broad, doing so here would amount to completely rewriting the covenant. *See Eichmann* v. *Nat'l & Health Care Servs. Inc.*, 719 N.E.2d 1141, 1149, 308 Ill. App. 3d 337, 241 Ill. Dec. 738 (Ill. App. Ct. 1999); *Lee/O'Keefe Ins. Agency, Inc.* v. *Ferega*, 516 N.E.2d 1313, 1319, 163 Ill. App. 3d 997, 114 Ill. Dec. 919 (Ill. App. Ct. 1987) (declining to modify the covenant as it "would have been tantamount to drafting a new contract"). Additionally, reforming the covenant would discourage "the narrow and precise draftsmanship which should be reflected in written agreements." *Lee/O'Keefe Ins. Agency, Inc.*, 516 N.E.2d at 1319. Because the original covenant not to compete is so broad and designed to protect Integrated from competition per se, the court will refuse to modify it. Thus, the court finds that the covenant not to compete is void and unenforceable. Kyrpides's motion for summary judgment as to this aspect of Integrated's breach of contract claim will be granted.[8]

### 2. Non-Solicitation Provision

Integrated also seeks to enforce the non-solicitation provision of the restrictive covenant providing that Kyrpides will not "recruit, solicit or induce, or attempt to induce, any employee or employees of the Company to terminate their employment with, or otherwise cease their relationship with, the Company . . . ." Employment Agreement § 6(a)(2). Integrated argues that this provision is reasonable because employers have a protectable interest in maintaining a stable

---

[8] Because the court finds the covenant not to compete unenforceable as a matter of law, the court will grant summary judgment in Kyrpides's favor on his first affirmative defense as it relates to this provision.

workforce. Although the Illinois Supreme Court has not directly ruled on the issue, it upheld a no-hire provision restricting one party from hiring the other party's employees, finding the employees to be the company's sole asset and thus that a legitimate reason existed for the provision. *H & M Commercial Driver Leasing, Inc.* v. *Fox Valley Containers, Inc.*, 805 N.E.2d 1177, 1184, 209 Ill. 2d 52, 282 Ill. Dec. 160 (Ill. 2004). One Illinois appellate court found maintaining a stable workforce to be a legitimate business interest protectable by a restrictive covenant. *Arpac Corp.* v. *Murray*, 589 N.E.2d 640, 650, 226 Ill. App. 3d 65, 168 Ill. Dec. 240 (1992); *see also Malone* v. *Cort Furniture Corp.*, No. 02 C 1729, 2002 WL 1874819 (N.D. Ill. Aug. 13, 2002) (relying on *Arpac* and *Torrence* v. *Hewitt Assocs.*, 493 N.E.2d 74, 143 Ill. App. 3d 520, 97 Ill. Dec. 592 (Ill. App. Ct. 1986), to find a non-solicitation of employees covenant valid). This court agrees with the *Arpac* court that employers have a legitimate interest in preventing the solicitation of their employees by a former coworker.[9] The conclusion that a non-solicitation provision is valid is bolstered by the fact that such a provision does not significantly restrain trade. An individual subject to such a covenant may still engage in his trade. He is only prevented from contacting former coworkers to have them join him at his new employer; those former coworkers are not prevented from seeking a job with that employer. Consequently, the

---

[9] Where the Illinois Supreme Court has not addressed an issue, Illinois appellate court decisions are persuasive authority that a federal court sitting in diversity will apply unless it has a "compelling reason to believe that they have stated the law incorrectly." *Adams* v. *Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004) (internal quotation marks omitted). Although the court notes that several federal district courts have disagreed with the appellate court's holding in *Arpac*, *see Hay Group, Inc.* v. *Bassick*, No. 02 C 8194, 2005 WL 2420415, at *7 (N.D. Ill. Sept. 29, 2005); *YCA, LLC* v. *Berry*, No. 03 C 3116, 2004 WL 1093385, at *17 (N.D. Ill. May 7, 2004); *Unisource Worldwide, Inc.* v. *Carrara*, 244 F. Supp. 2d 977, 983 (C.D. Ill. 2003), it is not convinced that *Arpac* stated the law incorrectly or that the reasoning of the other federal district courts is more persuasive.

court finds the non-solicitation provision reasonable and enforceable.[10]

### D. Integrated's Performance of Its Obligations

A material breach of contract can excuse the non-breaching party from performing its obligations under the contract. *Virendra S. Bisla, M.D., Ltd.* v. *Parvaiz*, 884 N.E.2d 790, 795, 379 Ill. App. 3d 567, 318 Ill. Dec. 822 (Ill. App. Ct. 2008). A breach is considered material if "performance of that provision 'was a *sine qua non* of the contract's fulfillment.'" *Arrow Master, Inc.* v. *Unique Forming Ltd.*, 12 F.3d 709, 714 (7th Cir. 1993) (quoting *Sahadi* v. *Cont'l Ill. Nat'l Bank & Trust Co.*, 706 F.2d 193, 198 (7th Cir. 1983)).[11] A minor breach, however, does not preclude enforcement of the contract. *Id.* (citing *Regan* v. *Garfield Ridge Trust & Sav.*, 581 N.E.2d 759, 765, 220 Ill. App. 3d 1078, 163 Ill. Dec. 605 (Ill. App. Ct. 1991)). Even if a material breach has occurred, the non-breaching party may waive the right to assert a breach of contract by "indicating that strict compliance with contractual provisions will not be required." *Solai & Cameron, Inc.* v. *Plainfield Cmty. Consol. Sch. Dist. No. 202*, 871 N.E.2d 944, 960, 374 Ill. App. 3d 825, 313 Ill. Dec. 217 (Ill. App. Ct. 2007). "[A] party to a contract may not lull another party into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance." *Vandevier* v. *Mulay Plastics, Inc.*, 482 N.E.2d 377, 381, 135 Ill. App. 3d 787, 90 Ill. Dec. 558 (Ill. App. Ct. 1985).

---

[10] Because the court finds the non-solicitation provision to be reasonable, the court will grant Integrated's motion for summary judgment on Kyrpides's first affirmative defense as it relates to this provision.

[11] Illinois courts treat the determination of materiality as a question of fact, requiring consideration of "whether the breach worked to defeat the bargained-for objective of the parties or caused disproportionate prejudice to the non-breaching party, whether custom and usage considers such a breach to be material, and whether the allowance of reciprocal non-performance by the non-breaching party will result in his accrual of an unreasonable or unfair advantage." *Sahadi*, 706 F.2d at 196 (collecting Illinois cases).

Kyrpides argues that he cannot be held liable for any breach of the employment agreement as Integrated materially breached its obligation to pay him his salary on a timely basis. Integrated admits it was consistently late in paying its employees from 2002 until Kyrpides left the company in 2004. Failure to pay timely wages is considered a breach of the employment relationship. *See Francorp, Inc.* v. *Siebert*, 126 F. Supp. 2d 543, 547 (N.D. Ill. 2000) ("It is axiomatic that an employer's failure to compensate its employees violates the employment relationship."). The court need not determine whether Integrated's breach was material, however, because Kyrpides waived his right to assert non-compliance and suspend his obligations under the agreement. Kyrpides did this explicitly by agreeing to accept delayed payments when asked by Veronika Vonstein, Integrated's vice president of operations. He implicitly did so by continuing to work for Integrated for almost two years despite the delayed paychecks. Even though he complained about the late payments at least once to Dr. Schulze, Kyrpides's conduct demonstrates that he accepted Integrated's inability to strictly comply with its duty to make salary payments on a timely basis and is now precluded from asserting that breach.[12]

### E.      Kyrpides's Alleged Solicitation of Ivanova

Having determined that the non-solicitation provision is enforceable against Kyrpides and that Integrated performed its obligations under the employment agreement, the court must

---

[12] Kyrpides argues that *Francorp* dictates that the court find Integrated to have materially breached the agreement. *Francorp* did not present the same waiver situation as in this case. It is true that the *Francorp* court notes that the employees in that case "tolerated late paychecks for a time and exhibited an understanding toward Francorp's financial condition." *Francorp*, 126 F. Supp. 2d at 547. Here, however, Kyrpides explicitly agreed to receive delayed paychecks.

consider whether Kyrpides breached this provision.  Integrated maintains that Kyrpides violated the provision by telling JGI that he would bring with him a "core group" of individuals from Integrated during his interview and by soliciting Ivanova to obtain employment at JGI while they were still employed by Integrated.

There is no dispute that Kyrpides told the JGI interviewer that he knew of several Integrated employees who might be interested in joining him at JGI.  Kyrpides, however, responds that, aside from Ivanova, the individuals he mentioned during his JGI interview were former, not current, Integrated employees.  Integrated has presented no evidence to the contrary and instead only contests whether Kyrpides solicited Ivanova to leave JGI.  Kyrpides wrote a letter of recommendation to JGI on Ivanova's behalf in March 2004.  In supplementing his professional resume at JGI in 2005, Kyrpides also took credit for "identify[ing] and recruit[ing] a group of world experts in microbial genomic analysis and metabolic reconstruction."  Ex. 17 to Integrated's L.R. 56.1 Stmt.  He included Ivanova and two other former Integrated employees as part of this group.

Whether Kyrpides's actions constitute solicitation and whether he did anything else that would constitute solicitation is open to dispute and requires evaluating the credibility of the witnesses.  Kyrpides has testified that he never solicited Ivanova and, in writing her a letter of recommendation, was following Integrated's customary practice regarding such letters.  Kyrpides further testified that when he found out Ivanova was considering leaving, he asked her what he could do to make her stay at Integrated and that she replied, "There is nothing that would make me stay.  I am determined to leave, and I'm looking for alternative positions." Kyrpides Dep. 340:14–16.  Kyrpides further supports his position with Ivanova's affidavit

stating that Kyrpides never solicited her to leave Integrated, that she began seeking new employment in September 2003, prior to Kyrpides's interview with JGI, and that she left due to financial and personal considerations.

It is not the court's role on summary judgment to determine which party's version to credit and which inferences should be drawn from the evidence. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Payne* v. *Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder."). Thus, the court finds that a genuine issue of material fact exists as to whether Kyrpides indeed solicited Ivanova.

## F.    Damages

Although Kyrpides argues that Integrated cannot show damages, Integrated has sufficiently established that it suffered damages as a result of Ivanova's departure to survive summary judgment. Kyrpides himself admitted that both he and Ivanova would be difficult to replace and that doing so would take Integrated at least a year. Kyrpides has not countered Elling's statement that hiring a qualified replacement for Ivanova and having that replacement become profitable cost Integrated a considerable amount of money. Kyrpides does argue that Ivanova's services were not that valuable to Integrated as it did not hire a replacement or enter into an outsourcing contract until 2007. This does not go to the existence of damages, but to their extent. While the jury may ultimately determine that Kyrpides's role in soliciting Ivanova

was minimal and therefore that Integrated's damages arising from his solicitation are negligible, this is an issue proper for the jury's, not the court's resolution. Thus, summary judgment will be denied on Integrated's breach of contract claim as it relates to the non-solicitation provision.

## II.     Breach of Fiduciary Duty

To prevail on its breach of fiduciary duty claim, Integrated must establish that (1) Kyrpides owed Integrated a fiduciary duty, (2) Kyrpides breached this duty, and (3) the breach proximately caused Integrated injury. *Neade* v. *Portes*, 739 N.E.2d 496, 193 Ill. 2d 433, 250 Ill. Dec. 733 (Ill. 2000). While an Integrated employee, Kyrpides owed Integrated a duty of loyalty. *See Dames & Moore* v. *Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 823 (N.D. Ill. 1998) (citing *ABC Trans Nat'l Transp., Inc.* v. *Aeronautics Forwarders, Inc.*, 379 N.E.2d 1228, 1237, 62 Ill. App. 3d 671, 20 Ill. Dec. 160 (Ill. App. Ct. 1978)). This duty included the duty not to solicit coworkers away from Integrated. *Id.* (citing *ABC Trans Nat'l*, 379 N.E.2d at 1237). Thus, Kyrpides could be found to have breached his fiduciary duty of loyalty to Integrated if he solicited Ivanova to join JGI while both were still employed by Integrated. *See Hill* v. *Names & Addresses, Inc.*, 571 N.E.2d 1085, 212 Ill. App. 3d 1065, 157 Ill. Dec. 66 (Ill. App. Ct. 1991) ("In breach of her duty of loyalty to her employer, [the employee] cooperated in the solicitation of [her assistant] and in her resulting job interview while both were still employed by [the employer], but after [the employee] had accepted [another] offer.").

As discussed above, a genuine issue of fact exists as to whether Kyrpides solicited Ivanova while both were still employed by Integrated. Similarly, Integrated has sufficiently established it suffered as a result if solicitation is found. Thus, the court will deny summary judgment on Integrated's breach of fiduciary duty claim.[13]

### III.     Tortious Interference with Prospective Economic Advantage

In its complaint, Integrated alleges that Kyrpides acquired extensive knowledge of Integrated's customer and employee base, enabling him to offer Integrated's customers a competing product developed in violation of his employment agreement. On summary judgment, however, Integrated bases its claim on Kyrpides's alleged inducement of two Integrated employees, Joukov and Kaznadzey, to work on JGI projects, thus depriving Integrated of its employees' full efforts. *See Dames & Moore* v. *Baxter & Woodman, Inc.*, 21 F. Supp. 2d 817, 825–26 (N.D. Ill. 1998) (firm could maintain claim for tortious interference with prospective economic advantage against competitor based on competitor's interference with the firm's employees).

To prevail on a claim for tortious interference, Integrated must establish that (1) it had a reasonable expectation of entering into a valid business relationship; (2) Kyrpides knew of Integrated's expectancy; (3) Kyrpides purposefully interfered with this expectation, preventing Integrated from entering into a valid business relationship; and (4) Integrated suffered damages as a result of this interference. *Fellhauer* v. *City of Geneva*, 568 N.E.2d 870, 878, 142 Ill. 2d

––––––––––––––––––––––––

[13] As with the breach of contract claim, Kyrpides argues that Integrated materially breached its obligation to Kyrpides by failing to pay him his wages on a timely basis, relieving him of his duty of loyalty. One court in this district has recognized such a failure as a valid defense to a breach of fiduciary duty claim. *V.I.M. Recyclers, L.P.* v. *Magner*, 271 F. Supp. 2d 1072, 1075 (N.D. Ill. 2003). The court need not address this issue, however, as it has found that Kyrpides waived any such argument by agreeing to delayed payments both explicitly and implicitly.

495, 154 Ill. Dec. 659 (Ill. 1991).[14] To establish purposeful interference, "a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but [that] the defendant has committed some impropriety in doing so." *Dowd & Dowd, Ltd.* v. *Gleason*, 816 N.E.2d 754, 768, 352 Ill. App. 3d 365, 287 Ill. Dec. 787 (Ill. App. Ct. 2004) (citation omitted).

Kyrpides argues that Integrated has not and cannot establish the third and fourth elements of this claim. The parties dispute whether Joukov and Kaznadzey did indeed moonlight on JGI projects and whether Kyrpides's interactions with the two Integrated employees constitutes purposeful interference. Even if this third element were established, however, Integrated has not

_____

[14] Kyrpides argues that California law should apply to Integrated's tortious interference claim. Illinois follows the Second Restatement approach, requiring the court to consider which state has the most significant relationship to the occurrence. *Esser* v. *McIntyre*, 661 N.E.2d 1138, 1141, 169 Ill. 2d 292, 214 Ill. Dec. 693 (Ill. 1996). In practice, the law of the place of injury controls unless Illinois has a more significant relationship. *Fredrick* v. *Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir. 2000) (quoting *Esser*, 661 N.E.2d at 1141). Contacts considered include (1) the place where the injury occurred, (2) the place where the conduct causing the injury occurred, (3) the parties' domiciles, and (4) the place where the parties' relationship is centered. Restatement (Second) of Conflict of Laws § 145(2). Courts will also consider "the interests and public policies of potentially concerned states . . . as they relate to the transaction in issue." *Jones* v. *State Farm Mut. Auto. Ins. Co.*, 682 N.E.2d 238, 249, 289 Ill. App. 3d 903, 224 Ill. Dec. 677 (Ill. 1997) (citation omitted) (internal quotation marks omitted). Here, Illinois is the place of injury and the other contacts to be considered are relatively evenly split between California and Illinois. Kyrpides argues that California has a strong public policy protecting its government employees from tort claims. Section 820.2 of the California Government Code provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov't Code § 820.2. This policy, however, is not strong enough to defeat the application of Illinois law, especially as Kyrpides has not carried his burden of establishing that his actions were within the scope of his employment. Oddly, among other things Kyrpides relies on as support for his affirmative defense that the California Government Code bars any tort claims against him is the Regents of the University of California's Memorandum of Law in support of their Motion to Dismiss in this case that states that Kyrpides's actions were not within the scope of his employment at JGI. Because Kyrpides has not established that the California Government Code protections apply to this action, summary judgment will be granted in favor of Integrated on Kyrpides's ninth affirmative defense.

Similarly, Kyrpides's statute of limitations affirmative defense has no merit, as the statute of limitations for tortious interference for prospective economic advantage in Illinois is five years and the complaint was filed well within this period. Thus, summary judgment will be granted in favor of Integrated on Kyrpides's seventh affirmative defense.

demonstrated that it was damaged as a result. Despite generally arguing that Joukov and Kaznadzey did not give Integrated their full efforts, Integrated has presented no evidence to support this assertion. Joukov and Kaznadzey did not leave Integrated's employ because of Kyrpides's actions, Integrated has not established that their productivity at work was any less than it otherwise would have been, and no evidence has been presented that Integrated lost customers because of their alleged work on JGI projects. This failure to establish damages is fatal to Integrated's claim. Thus, summary judgment on Integrated's tortious interference claim will be granted in favor of Kyrpides.

## IV.     Unfair Competition

Kyrpides has moved for summary judgment on this count of Integrated's complaint, which mimics Integrated's tortious interference with prospective economic advantage claim. As this court previously recognized, "the common law tort of unfair competition encompasses a 'broad spectrum of law' . . . . The principal form of the tort 'as it applies to circumstances arising from alleged interference with third party relations[ ] apparently falls under the rubric of tortious interference with prospective economic advantage.'" *Integrated Genomics, Inc.*, 2008 WL 630605, at *13 (quoting *Zenith Elec. Corp.* v. *Exzec, Inc.*, No. 93 C 5041, 1997 WL 223067, at *6 (N.D. Ill. Mar. 27, 1997)). As discussed above, Integrated has not provided any evidence of damages arising from Kyrpides's alleged interference with its employment relationship with Joukov and Kaznadzey. Therefore, Kyrpides's motion for summary judgment on this claim will be granted.

## V.     Kyrpides's Remaining Affirmative Defenses

## A. Failure to Mitigate Damages

Integrated contends that this affirmative defense should be stricken, as Kyrpides has not suggested what action Integrated could have taken, short of filing suit, to mitigate damages. Kyrpides does not respond to Integrated's request for summary judgment on this defense, apparently conceding the issue. Therefore, Integrated's motion for summary judgment on Kyrpides's third affirmative defense will be granted.

## B. Illinois Trade Secrets Act Preemption

The Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. § 1065 *et seq.*, is "intended to displace competing tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret." 765 Ill. Comp. Stat. § 1065/8(a). Because Integrated is not alleging that Kyrpides misappropriated trade secrets, but instead that he improperly solicited employees and tortiously interfered with Integrated's expectations of its employees, ITSA does not apply. *See id.* § 1065/8(b) ("This Act does not affect: (1) contractual remedies, whether or not based upon misappropriation of a trade secret . . . ; [or] (2) other civil remedies that are not based upon misappropriation of a trade secret . . . ."). Thus, Integrated's motion for summary judgment on Kyrpides's fourth affirmative defense will be granted.

## C. Moorman Doctrine

The *Moorman* doctrine, which bars tort recovery for purely economic losses, does not apply to actions for tortious interference with prospective economic advantage or breach of fiduciary duty. *See Cromeens, Holloman, Sibert, Inc.* v. *AB Volvo*, 349 F.3d 376, 398 (7th Cir. 2003) (citing *2314 Lincoln Park W. Condo. Ass'n* v. *Mann, Gin, Ebel, & Frazier, Ltd.*, 555

N.E.2d 346, 352, 136 Ill. 2d 302, 144 Ill. Dec. 227 (Ill. 1990)); *Aaron Transfer & Storage, Inc.*

v. *Bekins Van Lines, Inc.*, No. 02 C 1836, 2002 WL 31509775, at *2 (N.D. Ill. Nov. 12, 2002)

(citing *St. Paul Fire & Marine Ins. Co.* v. *Great Lakes Turnings, Ltd.*, 774 F. Supp. 485, 490

(N.D. Ill. 1991)).  The *Moorman* doctrine therefore does not apply to this action and Integrated's

motion for summary judgment on Kyrpides's fifth affirmative defense will be granted.

### D.    Westfall Act and the Federal Tort Claims Act

Kyrpides has asserted that he cannot be held liable under the Westfall Act, 28 U.S.C.

§ 2679, and the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* because he was at all relevant

times an employee of JGI, which he contends is a federal instrumentality.  Integrated disputes

that JGI is a federal instrumentality, citing to a letter from the U.S. Attorney's Office for the

Northern District of Illinois informing Kyrpides that JGI is not a federal instrumentality.

Regardless of whether JGI is considered a federal instrumentality, Kyrpides cannot seek refuge

in these statutes, as the only tort claim remaining, breach of fiduciary duty, concerns his actions

while an Integrated employee and does not involve actions falling within the scope of his

employment with JGI.  Thus, Integrated's motion for summary judgment on Kyrpides's sixth

affirmative defense will be granted.

## VI.    Kyrpides's Counterclaims

### A.    Breach of Contract and IWPCA Claim

In his counterclaim, Kyrpides alleges that Integrated breached its oral agreement with

Kyrpides to pay him his salary between September 1, 2001 and August 1, 2002.  He further

alleges that Integrated's failure to pay him wages on a timely basis between 2002 and 2004

violated the IWPCA, entitling him to interest and penalties as provided by 820 Ill. Comp. Stat.

28

§ 115/14. Integrated argues that Kyrpides's claims fail because he was an at-will employee whose salary could be modified at any time, and because he consented to the pay reduction and the receipt of late paychecks. As discussed, Kyrpides agreed to a voluntary pay cut between September 2001 and August 2002 and therefore cannot recover for Integrated's failure to pay him a higher salary during this time. Further, because Kyrpides agreed to the receipt of late paychecks, he is barred from recovering interest under the IWPCA. Thus, Integrated's motion for summary judgment on Kyrpides's breach of contract and IWPCA claims will be granted.

### B.     Breach of Promissory Note

Neither party disputes that Integrated breached its obligations under the promissory note. Integrated, however, maintains that Kyrpides's claim is barred by the doctrine of accord and satisfaction. "An accord and satisfaction is an agreement between the parties that settles a bona fide dispute over an unliquidated claim." *A.F.P. Enters., Inc.* v. *Crescent Pork, Inc.*, 611 N.E.2d 619, 623, 243 Ill. App. 3d 905, 183 Ill. Dec. 356 (Ill. App. Ct. 1993). The elements of accord and satisfaction are (1) an honest dispute as to the amount due at the time payment was tendered, (2) tender of payment with the explicit understanding of both parties that it is full payment of all demands, and (3) acceptance by the creditor with the understanding that the tender is accepted as full payment. *Id.* The doctrine only applies if the claim is unliquidated. *Saichek* v. *Lupa*, 787 N.E.2d 827, 833, 204 Ill. 2d 127, 272 Ill. Dec. 641 (Ill. 2003) ("Accord and satisfaction presuppose that the parties disputed the amount due but agreed to give and accept something other than that which they thought was due in order to settle a claim."). If there is a bona fide dispute, "[t]he creditor must either accept the payment with the condition or refuse it, and it makes no difference that the creditor protests or states that he does not accept the amount

proffered in full satisfaction. Under these conditions, a creditor has no right to cash the check and thereby obtain the benefit of such an offer without its accompanying burden of compromise." *A.F.P. Enters., Inc.*, 611 N.E.2d at 624.

The parties disagree on whether an honest dispute actually existed. Although Elling's January 27, 2006 letter stated that Integrated did not concede it had defaulted on the promissory note or that interest was due, this statement cannot create an honest dispute, as an honest dispute must have existed prior to this time. *See Saicheck*, 787 N.E.2d at 833. While Integrated may have disagreed that interest was due, the terms of the note and its failure to make timely payments belie this claim. Kyrpides had notified Integrated of its default and requested interest as provided by the promissory note in his December 5, 2006 letter to Elling.[15] Kyrpides's claim was liquidated. The method of calculation of the amount of interest due upon default until the principal was paid off was clearly provided for in the promissory note. Further, Integrated did not contest the amount of interest due prior to and at the time the final check was tendered.[16] In

---

[15] Kyrpides's email does not constitute "written notice" according to the promissory note, which required that "[a]ny notice to a party shall be deemed served if personally delivered or mailed by certified mail, return receipt requested, to the above listed address." Ex. B to Counterclaim ¶ 4. Lack of proper notice could have thus formed a basis for Integrated's claim that interest was not due, creating an honest dispute between the parties sufficient to create an accord and satisfaction. Integrated, however, has not raised this argument as a basis for the existence of an honest dispute, the court declines to construct the argument for it. *See 330 W. Hubbard Rest. Corp.* v. *United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel." (citations omitted) (internal quotation marks omitted)). Because the argument was not pursued by Integrated, the court concludes that it waived strict compliance with the notice provision of the promissory note.

[16] Although only mentioned in response to Kyrpides's assertion that no honest dispute existed, Integrated argues that the promissory note does not state whether the monthly interest was to be simple or compound. This issue, however, was not raised at the time payment was made and appears to be disingenuous given that Integrated calculated the interest owing for the period from when its final payment was due to when it was tendered according to the terms of the promissory note. Similarly, the fact that Kyrpides did not provide an exact number when asked at his deposition of how much interest

his response to Kyrpides's December 5, 2006 email, Elling only noted that payment would be made shortly instead of disputing the fact that interest was owed or how that interest was to be calculated. Because Integrated has not established that an actual dispute existed, it cannot in good faith claim that an accord and satisfaction occurred despite its attempt to style its January 27, 2006 payment as such. Thus, Kyrpides's motion for summary judgment on his breach of promissory note claim will be granted.

## CONCLUSION AND ORDER

For the foregoing reasons, Integrated's motion to strike [#208] is granted in part and denied in part. Integrated's motion for summary judgment on Kyrpides's second, third, fourth, fifth, sixth, seventh, and ninth affirmative defenses and Kyrpides's breach of contract and IWPCA counterclaims [#177] is granted. Summary judgment is granted in Kyrpides's favor on his first affirmative defense as it relates to the covenant not to compete and is granted in Integrated's favor as it relates to the non-solicitation provision. Kyrpides's motion for summary judgment on Integrated's claims for breach of the covenant not to compete, tortious interference with prospective economic advantage, and unfair competition and his claim for breach of promissory note [#180] is granted. Both parties' motions for summary judgment on Integrated's breach of contract as it relates to the non-solicitation provision of the employment agreement and breach of fiduciary duty claims are denied.

This case will be called for a status hearing on February 18, 2010 at 9:30 a.m. The parties are instructed to engage in a sincere effort to resolve this litigation and to report on these efforts at the status hearing.

---

was owing does not change the fact that the amount can be determined from the promissory note itself.

Dated: January 26, 2010          Entered: _____

JOAN HUMPHREY LEFKOW
United States District Court Judge